J-S69030-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF E.V., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.J.A., JR., NATURAL | : | |
| FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1047 WDA 2017 |

Appeal from the Decree Entered June 22, 2017
In the Court of Common Pleas of Fayette County Orphans' Court at No(s):
66 ADOPT 2016

| | | |
|---|---|---|
| IN RE: ADOPTION OF J.A., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.J.A., JR., NATURAL | : | |
| FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1049 WDA 2017 |

Appeal from the Decree June 22, 2017
In the Court of Common Pleas of Fayette County Orphans' Court at No(s):
65 ADOPT 2016

BEFORE:   BOWES, J., RANSOM, J., and STEVENS, P.J.E.*

MEMORANDUM BY RANSOM, J.:                    **FILED DECEMBER 21, 2017**

K.J.A., Jr., a/k/a K.A. ("Father"), appeals from the decrees dated June
22, 2017, and entered on June 26, 2017, granting the petitions filed by the
Fayette County Children and Youth Services ("CYS" or the "Agency"), to
involuntarily terminate his parental rights to his male children with S.V.
("Mother"), E.V., born in July of 2015; and J.A., born in August of 2014

_____
*   Former Justice specially assigned to the Superior Court.

(collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511.[1] We affirm.

The trial court set forth the factual background and procedural history of this appeal as follows.

> J.A. and E.V. are two young male children aged three (3) and two (2) years, born [in August of 2014 and July of 2015, respectively]. The [C]hildren have been in the same foster placement through Fayette County Children and Youth Services. J.A. was placed in May of 2015 and E.V. was placed after release from the hospital two days following birth.
>
> Fayette County Children and Youth Services became involved in the case on May 11, 2015. At that time, J.A.[,] at nine (9) months of age[,] suffered a broken femur. He was evaluated at Children's Hospital in Pittsburgh, Pennsylvania. There was no plausible explanation given by Mother (hereinafter referred to as S.V.) for this injury[,] and the case was indicated as abuse against S.V. and her paramour, J.D. S.V. [pleaded] guilty to Endangering Welfare of Children and Simple Assault on September 6, 2016 and was sentenced in October of 2016 to twenty-four (24) months Intermediate Punishment. (N.T. at 8 - 2/15/17).
>
> The [f]ather of both children, (hereinafter referred to as K.A.) was not residing with S.V. at the time of injury to J.A. CYS made contact with K.A.[,] and both he and S.V. signed a Family Service Plan. J.A. was adjudicated a dependent child on May 28, 2015 and E.V. was so adjudicated on July 27, 2015.
>
> After attempting to work with this family to complete the Family Service Plan, CYS filed Petitions to Involuntarily Terminate both parents' rights [on November 29, 2017]. The

_____

[1] On June 22, 2017, the trial court entered a decree voluntarily terminating Mother's parental rights to the Children. *See* N.T., 6/22/17, at 21. Mother has not filed appeals from the voluntary termination decrees, nor is she a party to the instant appeal.

hearings were conducted. Those hearings took place on February 15, 2017, March 24, 2017 and June 22, 2017.

On March 24, 2017, S.V. voluntarily relinquished her rights to both children. During that hearing in March of 2017, K.A. indicated on record a desire to relinquish his rights as well, however, after some confusion over what the PACA set forth as to phone calls, K.A. became irritated and refused to agree to relinquish. The hearing on March 24, 2017 was attended by telephone by K.A.[,] as he lives in Arizona. The hearing was continued on the Involuntary Petition to Terminate K.A.'s parental rights to June 22, 2017 to afford the opportunity for K.A. to personally appear. At the time of hearing, K.A., through counsel, did not testify and did not call any witnesses. K.A. was present at that final hearing.

Trial Court Opinion, 8/23/17, at 1-2.[2]

In its opinion, the trial court found the facts from the testimony at the termination hearings and made determinations from those facts, as follows:

K.A. was staying with friends and homeless at the time J.A. and E.V. were adjudicated dependent on May 28 and July 27 of 2015. He, as did S.V., entered into and signed a Family Service Plan on June 30, 2015. The goals of that plan were to maintain sobriety and drug and alcohol treatment, increase parenting skills, cooperate with CYS, maintain a bond with the children by visiting and undergo [sic] a mental health evaluation. (N.T. at 7 - Day 3-6/22/17).

Although S.V. voluntarily relinquished her rights on March 24, 2017, a brief recitation of Mother's involvement is necessary to provide some insight of this matter in general. At the February 15, 2017 hearing, Mary Vail testified. Ms. Vail is a

_____

[2] On April 24, 2017, the trial court appointed Attorney John A. Kopas, III, as legal counsel to represent the legal interests of the Children, citing **In re: Adoption of L.B.M.**, ___ Pa. ___, 161 A.3d 172 (2017) (filed on March 28, 2017). In addition, Attorney Meghann Mikluscak was guardian *ad litem* for the Children throughout the termination proceedings, and filed a brief in this appeal.

professionally licensed counselor who is employed at Chestnut Ridge Counseling Services. The [c]ourt recognized her as an expert in the field of therapy and counseling. (N.T. at 11 - Day 1-2/15/17).

Ms. Vail was the therapist for Mother, S.V. From the date of intake, S.V. did not appear until a year later. S.V.'s first session was August 3, 2016 where the two objectives were to modify S.V.'s lifestyle and attend therapy twice a month. S.V. failed to appear thereafter. S.V. had been diagnosed with depression and Post-Traumatic Stress Disorder and prescribed Prozac and Vizeral. She appeared for just one medication check. (N.T. at 17 - Day 1-2/15/17).

The bonding expert, Carol Patterson, testified that S.V. had not addressed her anger issues and that J.A. maintained a very minimal bond. E.V. had no bond or attachment to S.V. (N.T. at 46 - Day 1-2/15/17).

The [c]ourt will now address father, K.A.'s, lack of performance on the Family Service plan. K.A. signed the Family Service Plan on June 30, 2015. K.A. moved to Surprise, Arizona in December of 2015. K.A. was to maintain sobriety and receive a drug and alcohol treatment[,] if necessary. K.A. never completed an evaluation while in Fayette County, Pennsylvania. After residing in Arizona, K.A. informed CYS caseworker, Melanie Hlatky, that he went to a drug and alcohol agency in Arizona but left after the first time because "he was being judged for smoking marijuana." (N.T. at 12 - Day 3-6/22/17). On October 27, 2016, K.A. called and admitted that he smoked marijuana and smoked methamphetamines. This admission came well over a year after the [C]hildren were placed in care. (N.T. at 12 - Day 3-6/22/17).

Melanie Hlatky [   ] was the family service counselor assigned to the case by CYS to assist the parents in reunification and in completing the goals of the Family Service Plan. Ms. Hlatky testified that while K.A. lived in Pennsylvania, prior to December of 2015, twenty-eight (28) visits were scheduled. These visits were of an hour duration, once a week. Of the twenty-eight (28) visits, Father made only one-fourth or seven (7) visits. Of those, he left forty (40) minutes early on one visit. (N.T. at 9 – Day 3-6/22/17). The visits included three (3) in June, none in July, one (1) in August, none in September, two (2) in October, none in November and one (1) in December of

- 4 -

2015. Father has spent 5 hours and 20 minutes with his children in two and one-half years.

The [c]ourt finds that Father has failed to maintain a bond with the children. On the August 25, 2015, Hlatky noted that J.A. cried and stood by the door during the visit. K.A. stated to the caseworker that the child doesn't know him and won't stop crying. (N.T. at 10 - Day 3-6/22/17). Hlatky observed no bond. She notes that Father acted appropriately. E.V. only visited with K.A. four (4) times in total. Both children exhibited no emotional harm after leaving K.A. (N.T. at 11 - Day 3-6/22/17).

On April [13], 2016, K.A. asked CYS to consider his mother as a placement [resource]. The Interstate Compact was [previously] completed in February of 2016[, at the request of paternal grandmother, however,] and she was not approved. [(N.T., at 13, 17, - Day 3-6/22/17)]. In fact, K.A. had informed CYS that his mother had an abusive boyfriend in Arizona. He was working at the same restaurant as his mother and he was staying in various hotels. (N.T. at 15 - Day 3-6/22/17). The Court finds that K.A. has no permanent home in which to raise the [C]hildren.

During the March 24, 2017 hearing where Father appeared via telephone, K.A. was [poised] to surrender his rights voluntarily. He stated, "I'm giving up my rights to the foster family to be able to adopt my children. I'm making this decision because I want my children to have the life **I can't give them** (emphasis supplied) and the life I never had." (N.T. at 17 - Day 2-3/24/17). Yet, he wanted his own mother to care for his children[,] which makes no sense to this [c]ourt.

K.A. could not remember his address "right off the top of my head" (N.T. at 16 - Day 2-3/24/17), yet later came up with one during the March 24th hearing. He lives in Surprise, Arizona and is twenty-four (24) years old. He suffers from ADHD [(Attention Deficit Hyperactivity Disorder)] and mental health issues. (N.T. at 17 - Day 2-3/24/17). It is not known if he receives any treatment.

While discussing the PACA ("Post Adoption Contact Agreement"), K.A. agreed to the terms except the proposed telephone calls. He wanted a phone call "here and there." (N.T. at 23 – Day 2-3/24/17). The offer was a phone call every three months (N.T. at 24 - Day 2-3/24/17). K.A. became irritated and stated, "I take back on doing the voluntary stuff and sh--

(expletive)." With that statement, he hung up the phone while the [c]ourt was speaking. (N.T. at 24 - Day 2-3/24/17).

Part of the Family Service Plan was that K.A. would attend parenting classes to increase parenting skills. He never attended. K.A. was also to have a mental health evaluation. He never did. Father, K.A., failed every aspect of the Family Service Plan for reunification.

The [c]ourt now addresses the best interests of J.A. and E.V. The foster family who currently cares for both children are ready and willing to adopt. Every three months this [c]ourt held Permanency Review Hearings for these children. K.A. never responded. (N.T. at 14 - Day 3-6/22/17). Carol Patterson was recognized by the [c]ourt as an expert in the field of psychology with an emphasis in bonding assessment. Ms. Patterson has a Master's degree in counseling and has been a licensed psychologist in the Commonwealth of Pennsylvania since 1979. Mother, S.V., acknowledged that her children love their foster parents (N.T. at 5 - Day 2-3/24/17). Ms. Patterson observed the interaction between the [C]hildren and the foster parents. The [C]hildren call the foster parents "Mommy and Daddy"[,] and include them in all play activities. (N.T. at 31 - Day 1-2/15/17). Patterson opines that termination of parental rights would not be emotionally harmful[,] as a significant bond exists between the [C]hildren and foster parents. (N.T. at 34 - Day 1-2/15/17).

K.A. appeared at the last hearing but called no witnesses and did not testify.

Based upon the foregoing analysis of the statutory grounds for termination and the best interest analysis of the [C]hildren, the [c]ourt approved the Involuntary Termination of K.A.'s parental rights to both children. These children are presently in a stable family, a family that can provide continued love, protection and support. As Father most aptly stated, they can provide his children the life "he can't give them."

Trial Court Opinion, 8/23/17, at 5-9.

On June 22, 2017, the trial court entered the decrees voluntarily terminating Mother's parental rights to the Children, and involuntarily terminating Father's parental rights to the Children. On July 14, 2017,

Father timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) with regard to the termination orders. On July 26, 2017, this Court, acting *sua sponte*, consolidated Father's appeals.

In his brief on appeal, Father raises the following issue:

I. DID THE LOWER COURT ABUSE ITS DISCRETION IN TERMINATING THE PARENTAL RIGHTS OF THE NATURAL FATHER, K.J.A., AS FAYETTE COUNTY CHILDREN AND YOUTH SERVICES FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN ITS BURDEN OF PROOF?

Father's Brief, at 3.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, [19], 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [614 Pa. 275, 284,] 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, [575 Pa. 647, 654-655], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these

cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, [539 Pa. 161, 165,] 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 616 Pa. 309, 325-326, 47 A.3d 817, 826-827 (2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.*** (quoting ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will consider section 2511(a)(1) and (2) together, as did the trial court. Section 2511 provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2)  The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

First, Father argues that CYS failed to present clear and convincing evidence necessary to sustain its burden of proof to justify terminating his rights to the Children.  Father asserts that he did not evidence a settled purpose to relinquish his rights to his Children or refuse to perform his parental duties.  Father's Brief, at 7, 11.  Father challenges the sufficiency of

the evidence to support termination under section 2511(a)(1), claiming that the evidence at the hearing clearly demonstrated that he had taken steps toward satisfying his Family Service Plan ("FSP") objectives. *Id.* at 11. Father states that his FSP goals were: to maintain his sobriety; increase his parenting skills; maintain a bond with the Children; and cooperate with CYS. *Id.* Father also states that CYS later added a goal that Father must undergo a mental health assessment. *Id.* Father alleges that he attempted to maintain his sobriety by attending some drug and alcohol meetings in Arizona. *Id.* Father asserts that, although he failed to attend parenting classes, he acted appropriately around the Children during visits. *Id.*

Father also challenges the sufficiency of the evidence to support termination under section 2511(a)(2). Father's Brief, at 12. Father asserts that he has made efforts to remedy his drug problem; he has always acted appropriately towards the Children; he has sought to maintain a bond with the Children despite interference from the foster parents; and his mental health was never a primary concern for CYS. *Id.* Father alleges that, most importantly, his mother, ("Paternal Grandmother"), was willing to care for the Children in Arizona, so that Father could remain an important part of their lives. *Id.* Accordingly, Father asserts that he has not demonstrated such an incapacity, abuse, neglect or refusal that has caused the Children to be without essential parental care.

Finally, Father challenges the termination under section 2511(b). Father claims that the Children's foster parents inhibited his ability to maintain his bond with the Children, after he relocated to Arizona, by preventing Father from visiting with the Children via video conference. Father's Brief, at 19. Father asserts that he maintained his contact with CYS, even after he moved to Arizona. *Id.* Father also states that, although he did not receive a mental health evaluation, CYS added the mental health evaluation goal to the list of his initial FSP objectives, and it was not a primary goal listed by CYS. *Id.* Father asserts that, although he continues to battle drug addiction, CYS could have resolved the Children's cases in early 2016 by transferring the cases to Arizona to enable Paternal Grandmother to care for them, and Father could have continued to be an important part of their lives. *Id.* at 7, 11. Father claims that CYS failed to facilitate the transfer of the Children's cases to Arizona, and "remained idle while a few 'hiccups in the paperwork' derailed the ICPC ("Interstate Compact on the Placement of Children") [p]rocess." *Id.* Accordingly, Father blames CYS for failing to facilitate the proper kinship placement of the Children. **Id.** at 7, 11.

With respect to subsection 2511(a)(1), our Supreme Court has held as follows.

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment

contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 550 Pa. 595, 602, 708 A.2d 88, 92 (1988).

Further, this Court has stated:

[T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 854-855 (Pa. Super. 2004) (citations omitted).

Regarding the definition of "parental duties," this Court has stated as follows:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

* * *

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental

- 12 -

responsibilities while others provide the child with his or her physical and emotional needs.

*In re B.,N.M.*, 856 A.2d at 855 (citations omitted).

The trial court considered Father's explanation for his failure to perform his parental duties as well as his post-abandonment conduct, and found that Father was unacceptably relying on others to care for the Children while refusing to address his FSP objectives. Father's failure to complete his FSP objectives so that he could assume his parental duties is a failure on his part, not on the part of CYS or the foster parents. Father's reliance on CYS and the Children's foster parents to care for the Children, and then his attempt to place blame on CYS and the foster parents for his own shortcomings is not a valid reason for his failure to perform his parental duties. *In re B.,N.M.*, 856 A.2d at 855. Moreover, Father cannot assert that CYS should have allowed him to rely on his mother to perform his parental duties for him, especially where the trial court found that Paternal Grandmother was not a suitable kinship care placement in any event. *Id.*

Further, we find Father's contention that CYS did not take swift action regarding transferring the case to Arizona, and that CYS did not consider Father's mental health a primary goal for him to meet, is akin to arguing that CYS did not make reasonable efforts to reunify the Children with him. *See* Father's Brief, at 7, 11. When reviewing a termination decree on appeal, we do not consider whether CYS made reasonable efforts. Our Supreme Court has rejected the argument that the provision of reasonable

- 13 -

efforts by the county children's services agency is a factor in termination of the parental rights of a parent to a child. *See In the Interest of: D.C.D., a Minor*, 629 Pa. 325, 345-351, 105 A.3d 662, 673-674, 676 (2014) (rejecting the suggestion that an agency must provide reasonable efforts to enable a parent to reunify with a child prior to the termination of parental rights, and rejecting the suggestion that section 2511 of the Adoption Act should be read in conjunction with section 6351 of the Juvenile Act, particularly section 6351(f)(9)(iii)). Thus, based on our Supreme Court's holding in *In the Interest of: D.C.D., a Minor*, we find no merit to Father's argument.

After a careful review of the record, this Court finds the trial court's conclusion that Father has failed to perform parental duties with regard to the Children, and its termination of his parental rights under section 2511(a)(1), is supported by competent, clear and convincing evidence in the record. *In re Adoption of S.P.*, 616 Pa. at 325-326, 47 A.3d at 826-827.

Next, to satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825

A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002).

We find that the trial court's conclusion regarding section 2511(a)(2) is supported by competent, clear and convincing evidence. For the reasons expressed in relation to section 2511(a)(1), Father cannot place blame for his failure to remedy the causes of his incapacity to parent the Children on CYS and the foster parents in relation to section 2511(a)(2). *See In re B.,N.M.*, 856 A.2d at 855. Father also may not argue that CYS failed to make reasonable efforts to reunify the Children with him. *See In the Interest of: D.C.D., a Minor*, 629 Pa. at 345-351, 105 A.3d at 676. Thus, we find no abuse of discretion in the trial court's termination of Father's parental rights to the Children pursuant to section 2511(a)(2).

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare

- 15 -

of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [533 Pa. 115, 121, 620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 620 Pa. 602, 628-629, 71 A.3d 251, 267 (2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent,

to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted). Here, the trial court appropriately considered the safety of the Children as weightier than any affection the young children might feel for Father.

Further, this Court has held that a parent's love of his child, alone, does not preclude a termination. *See In re L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007) (stating that a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life

"simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

After a careful review of the record, we find that termination of Father's parental rights to the Children was warranted pursuant to section 2511(b), as the evidence showed that the Children's developmental, physical and emotional needs and welfare will best be met by the termination of Father's parental rights. Further, the evidence showed that there is no bond between Father and the Children that is worth preserving. As there is competent evidence in the record that supports the trial court's findings and credibility determinations, we find no abuse of the trial court's discretion in terminating Father's parental rights to the Children under section 2511(b). *In re Adoption of S.P.*, 616 Pa. 309, 325-26, 47 A.3d 817, 826-27.

We, therefore, affirm the trial court's decrees terminating Mother's parental rights to the Children.

Decrees affirmed. Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/21/2017

- 18 -